## Heacock Estate

*J. Lawrence Grim, Jr.,* for accountant.

*Robert L. White,* for Commonwealth.

SATTERTHWAITE, P. J., June 27, 1967.—The first and final account of Mabel M. Heacock, executrix of the estate of said decedent, was presented to the court for audit, confirmation and distribution of ascertained balances on November 7, 1966, as advertised according to law. . . .

The only claim against the estate, and the only question for adjudication arising therefrom, is that of the Commonwealth for additional transfer inheritance taxes assertedly due by reason of an inter vivos transfer by decedent to his son of certain farm machinery allegedly in contemplation of death. Pursuant to section 1001 of the Inheritance and Estate Tax Act of June 15, 1961, P. L. 373, 72 PS §2485-1001, accountant elected to have the correctness of the Commonwealth's assessment of tax by reason of this transfer determined at the within audit. (Taxes otherwise admittedly due apparently have been paid and discharged in full.)

Decedent, a retired or semi-retired farmer by occupation, died on June 15, 1964, of a cerebral vascular accident or "stroke" occurring about 11 hours prior to the time of actual demise. He was then 66 years and some months of age. Beginning about the year 1960, decedent, who had farmed all of his life, began to operate his farm (apparently titled in the name of himself and accountant, his wife, as tenants by the entireties) less and less through his own personal efforts and more and more through the labors of his son, Robert E. Heacock, his only child, who, although married and living elsewhere, had likewise spent all of his adult life working on the farm. The record is most uncertain as to the details of the financial terms which had been understood between father and son

in implementation of their arrangement, but in the course of this gradual retirement process by decedent apparently it was agreed that the son should take substantially all of the net product of the farm, as recompense for his labors, to the extent that the income therefrom exceeded the amount of earned income which decedent could lawfully enjoy without diminishing the Social Security retirement benefits which he had been collecting since he had attained age 65.

In November or December 1963, decedent and his son mutually decided that, since the former "was reaching the age that he no longer wanted or could work as hard as he had in the prime", and since the latter was then doing most of the work and making his livelihood on the farm, and since the father had no other interests or hobbies and wanted to continue to live and work on the farm as little or as much as he pleased without having the whole income therefrom attributed to him possibly in jeopardy of his Social Security retirement benefits, therefore, it would be well to document their status by transferring title to the farm machinery from father to son.

They consulted counsel in December or January about effectuating this transfer, and on May 11, 1964 (which, as it happened, was just 35 days prior to decedent's death), a formal bill of sale, for a nominal consideration of $1, was executed by decedent and his wife to the son for the subject farm machinery. The aggregate value thereof has been fixed at $14,548.45, a figure which is not in dispute, and it is the inheritance tax at the rate of two percent on this valuation, plus penalty, which is the subject of the within proceedings.

Decedent had executed his last will on January 20, 1956, and no change was considered or made therein during the conferences with the lawyer leading up to the execution of the subject bill of sale. Decedent

thereby bequeathed his entire estate to accountant, his wife, with provision for his son Robert only in the event of his wife's predecease. His gross testamentary estate amounted to only $5,548.01, consisting chiefly of shares of stock which accountant has already transferred to herself, advancing other funds to pay claims and administration expenses.

Section 222 of the Inheritance and Estate Tax Act of 1961, 72 PS §2485-222, provides, in relevant part:

"A transfer . . . (not for adequate consideration) . . . made in contemplation of the death of the transferor, is subject to tax under this act. A transfer . . . , *unless shown to the contrary*, shall be deemed to have been in contemplation of death if it is of a material part of the transferor's estate and is made within two (2) years prior to the death of the transferor.

"A transfer is made in contemplation of death when the dominant or impelling motive, but not necessarily the sole motive of the transferor, *was prompted by the thought of death*, without which motive the transfer would not have been made. The term is not restricted to that expectancy of imminent death which actuates the mind of a person making a gift causa mortis". (Emphasis supplied.)

It is readily apparent that the subject transfer of the farm machinery was undoubtedly taxable under this statutory language unless accountant has sufficiently rebutted the legislative presumption as to motivation. Stated otherwise, since the gratuitous transfer of a material part of decedent's estate less than two years prior to his death unquestionably appears, it is the clear burden of the estate to establish the negative proposition that such disposition was not in contemplation of death, as the statute has defined the latter concept. Compare Miller Estate, 404 Pa. 156, 158 (1961), which, in reversing the lower

court decision, reported in 10 Fiduc. Rep. 353, pointedly illustrated the practical significance of this burden. See also Gumpert's Estate, 343 Pa. 405, 408 (1942).

It is the studied opinion of the auditing judge, after careful and detailed analysis of the circumstances disclosed by the within record, that accountant has, in fact, sustained this heavy burden of persuasion and that, therefore, the subject assessment of tax should be set aside.

Little may be gained by attempting to review and summarize the vast number of lower court decisions which have passed upon the general subject of transfers in contemplation of death under the prior Inheritance Tax Law, the Act of June 20, 1919, P. L. 521, sec. 1 (c), as amended by the Act of May 16, 1929, P. L. 1795, now repealed. Suffice it to note that the definitions developed therein have, to a large degree, been codified and restated by the legislature in the express and specific statutory declaration set forth, as an entirely new provision, in the second paragraph of section 222 of the Act of 1961 hereinabove quoted. It is clear thereby that a transfer is taxable in this context when, and only when, the dominant, although not necessarily exclusive, motivation was the thought of death, a motivation which must have been at least the sine qua non, or the circumstance without which the transfer would not have been made, although it need not have been so pressing or urgent as to constitute the expectancy of imminent death necessary as a legal element of a gift causa mortis.

The within record affirmatively demonstrates that decedent did not have death in mind as the impelling or causative motivation for the transfer of the farm machinery in question. That transfer came about under a background set of circumstances which not only negates as the occasion therefor any significant

thought in decedent's mind of his own departure from this life in the foreseeable future, whether near or distant, but also establishes the continued-life purposes which he sought to be accomplished thereby. The transaction was primarily and fundamentally brought about by decedent's desire to plan for and arrange his affairs, not for his death, but for his own old age, a distinction which has legal significance in this connection. Compare Dehon Estate, 76 D. & C. 265, 267 (1951).

It is unquestionably true that decedent, for at least the last two years of his life, had been subject to a condition of hypertension or high blood pressure, and that he had been consulting his physician on an average of once a month by reason thereof. Moreover, it also appears from the medical testimony in the case that his hypertension was gradually increasing as time went by, although the severity thereof was concealed from him by his physician; and his complaints were only of tiredness, dizziness and headaches, symptoms which, in themselves, do not inherently give grave concern to the lay mind.

This condition, however, and the happenstance of his sudden and unanticipated death less than two years after the subject transfer, thus giving rise to the statutory presumption, are the only circumstances in any way leading toward an inference of contemplation of death, and they are completely overcome by other factors presented in the record.

The testimony discloses, for example, that, although decedent, by temperament, was nervous and worrisome, he never expressed or otherwise indicated any apprehension of death. By way of contrast, he did worry about other things in his living future: He frequently expressed concern and even dread about the prospect of surgical operations for the removal of cataracts from one or both eyes, an unpleasant, but not

mortal, experience which he would not have thought necessary to face as a practical matter had he any premonition of his early demise in the foreseeable future, since his impaired vision quite apparently did not approach blindness and did not require urgent treatment. He also was deeply concerned about protecting his Social Security income and desired to be able to demonstrate, should any question be raised, that although he still did some work on and about the farm to keep himself occupied, the farming operations had, in fact, been turned over to his son and the income thereof should no longer be attributable to him.

Moreover, his attitude toward his own physical condition as he understood it was quite well exemplified by his activities. He had been advised by his physician to have monthly check-ups, to take his medicine regularly, to relax, reduce his weight and "take it easy"; and told that if he followed this regime his high blood pressure could be kept under control. His lack of understanding, or at least concern, about the potential seriousness of his condition, however, was shown by his lack of diligence in following this advice. He went to the doctor somewhat more frequently than once a month during the winter and early spring months of 1964 and actually lost some little amount of excessive weight. But when the duties of the farm became more demanding upon his son and himself in the spring haying and planting season, he not only failed to return to his physician for his regular monthly examination (his last visit to the doctor was almost two full months prior to his death), but also spent much time in physical labor on the farm fields. Vigorous physical activity during the relevant period may be a contraindication in a contemplation of death case: Dillon Estate, 48 Westmoreland 37 (1966).

Decedent's lack of apprehension of death is further corroborated by the very time interval between the

occasion of the agreement with his son to transfer the machinery to him in November or December 1963, and the time of actual consummation thereof in May 1964. Had he really been motivated by death considerations, it is inconceivable that he would have permitted at least five months to elapse before completion of the transaction. Compare Slaughenhaup Estate, 1 Adams 181 (1960); Speakman Estate No. 2, 23 D. & C. 2d 626 (1961). Similar doubt that he regarded the transfer as equivalent to, or in the nature of, a testamentary arrangement arises from the factual inconsistency of the same with the scheme of his will, which, although executed almost eight years earlier through the auspices of the same lawyer, he did not see fit to change. His wife, not his son, had been, prior to the transaction in question, and still continued to be thereafter, the primary object of his testamentary bounty.

The fact of prolonged medical consultation and treatment, if there was no awareness of the factually serious nature of the underlying malady, does not, in itself, compel the conclusion of action in contemplation of death where, as here, life motives were involved: Kantner Estate, 3 Fiduc. Rep. 81 (1952); Eshelman Estate, 8 Fiduc. Rep. 593 (1958); Beale Estate, 34 D. & C. 2d 360 (1964). And such life motives may be found, in addition to those already mentioned, in the circumstance, inter alia, of the disposition of what might be regarded as business assets or property related thereto on the retirement of the donor: Bisbee Estate, 89 D. & C. 309 (1954); especially where the gift thereof is to recompense a faithful and loyal son who had long served and been associated in such business: Price's Estate, 62 York 193 (1949).

For the reasons stated, the auditing judge hereby finds that the transfer of the farm machinery by decedent to his son was not in contemplation of death

in fact, and, accordingly, that there is no liability for transfer inheritance tax by reason thereof. . . .

And now, June 27, 1967, the within adjudication is directed to be filed and is hereby confirmed nisi.